Edie Cunningham of the Federal Defender's Office on behalf of Ms. Quintero. The District Court interpreted 4241 D as requiring the detention of all defendants found incompetent to stand trial even if they've been released under the Bail Reform Act. This practice makes no sense under contemporary standards. The automatic detention of all defendants found incompetent to stand trial is unnecessary as we know from successful outpatient programs in Arizona and many other states. In fact, Judge Soto, who is a former district judge, excuse me, a former Arizona judge and the district judge in this case, recognized that Arizona's outpatient programs have proven effective and we have identified programs that are ready and willing to serve Ms. Quintero. So, but Ms. Cunningham, doesn't Congress have the right to enact legislation that I understand your point about, from a policy perspective, there could be better ways to handle people who are found to be incompetent, but what are we supposed to do about that in the face of the language of the statute? Well, Your Honor, due process analysis requires an individualized determination of whether inpatient confinement is necessary under Lopez Valenzuela, Salerno, Selle, Vitek, and other cases. Equal protection analysis requires the same thing. So does a hybrid of those guarantees and the Eighth Amendment and the Rehabilitation Act and even American Bar Association standards. And I understand, Judge Bedi, your concern, but this statute was passed in 1984 and as we argue, the statutory language is broad enough to grant the relief that we seek, but we, the Constitution and the Rehabilitation Act also require it. But keep in mind that Congress made no findings on this. There were not hearings on whether outpatient would be good enough or not, because outpatient restoration simply wasn't established back then. In my reading, I think that there were maybe a couple of pilot programs in a couple of states back then, but this was not something that was really on the radar. It wasn't really on the radar at the time this court decided strong. It's only been in the last 10 to 15 years that these programs have become so well established. And I would like... You seem to be asking us to rewrite the statute in light of improvements or changes in the same concern Judge Bedi has. The statute is very clear as I read it, and while the Attorney General might have the authority to do what you suggest, it seems to me you either have to go back to Congress to get the statute amended or convince the Department of Justice that the Attorney General should exercise his discretion in a different way than what the statute commands him to do. Oh, I do want to move on to talking about the constitutional issues, but quickly to address your point, which is a very good one. And if we are unsuccessful here, we intend to do just those things. You know, given the circumstances of the last couple of years, there really hasn't been an opportunity to pursue this change in Congress. Congress has had a hard time doing things like keeping the government open, so there hasn't been an opportunity to do that. But certainly, I take your point, and we do understand that if we lose the legal challenge, it's a policy issue, and we think we have the much better argument on the policy issue, and we intend to try that. But we also maintain very strongly that this practice violates the Constitution and the Rehabilitation Act. And I would first like to address the due process issue, the substantive due process issue. Heightened scrutiny must apply because the right to pretrial liberty is a fundamental right. Under Salerno, Falca, Lopez, Valenzuela, there can be no doubt about that. And because it's a fundamental right, constitutional analysis requires detention to be the least restrictive means of meeting the government's objectives. Counselor, it's to me, there's a big difference here. We're talking about the nature of the proceedings and is able to assist counsel with her defense. And two mental health professionals have now examined her. And the court has now entered a finding that she is currently not competent to stand trial. And that's very different from the type of decisions that are made under the bail reform act, where essentially, you're arguing factors of danger to the community, and whether or not there are suitable alternatives to incarcerating a defendant to ensure that they're there for trial. Here, we've got a legal and a medical challenge. And the law provides that once the court makes the determination that there's a deficiency, a mental deficiency that needs to be addressed, then the law commands that the person be committed to a suitable institution where he or she will get evaluation by mental health professionals and hopefully come up with a restoration plan. And I guess I'm having a hard time understanding why I should look to the bail reform act and declare that since the insanity act is different from the bail reform act, that's a violation of equal protection. I just don't follow your argument. Well, your honor, the analysis is the same. The analysis is that the detention has to be necessary to meet the government's objectives. The government needs to prove this by clear and convincing evidence that it's the least restrictive means. And certainly, and this is the way it's done in Arizona and many other states all the time, the defendant is evaluated if they're not evaluated. The competency restoration treatment and evaluation, further evaluation can be done on an outpatient basis. It's the medical diagnosis or the ability to make a reason diagnosis that concerns me. There's no question that 24 7 mental health evaluation yields far more significant data than having somebody come into a clinic on a walk-in basis, maybe once a week or every other day or whatever it is. And that that is part and parcel of the evaluation that takes place at a prison mental health facility where the person is under observation 24 7 and is treated or evaluated by a variety of mental health professionals. The empirical evidence, your honor, doesn't bear that out. And again, Congress made no findings. The federal system is the outlier. Now, at least 35 states allow for outpatient restoration. And many, many states have very well-established programs. And the empirical evidence shows you, and I've cited to it, I believe on pages 30 to 31. Because the states are doing it differently, that that's somehow an equal protection violation. And that seems to ignore Supreme Court authority that says just because states are individual laboratories that get to experiment in different ways doesn't make it a constitutional equal protection violation. You know, that's a very minor part of our argument. Our argument is that the constitutional standards for fundamental rights and the heightened scrutiny for significant liberty interests require a showing of necessity by clear and You've got a finding by the district court based on the opinion of two evaluating psychologists or psychiatrists that this individual is suffering from a mental ailment that makes her not competent to stand trial. I guess I go back to my earlier concern that that's a very different type of a concern than whether or not somebody should be released on bail. Well, your honor, one of those evaluators, Dr. Menchola, opined that the competency restoration and evaluation should occur in an outpatient setting because it would be so detrimental to Ms. Quintero, given her traumatic brain injury and her vulnerability in the prison setting, to do it there. So this can be done. Doctors can evaluate this issue. And the court can make a finding based on facts presented by the doctor as to whether outpatient is appropriate. And we know that it's not going to be appropriate in all cases. It's not going to be appropriate for defendants who are detained under the Bail Reform Act because they are dangerous. It is not going to be appropriate for defendants who have severe psychosis and are a danger to society. Excuse me. Counsel? Yes, your honor. Under Dr. Menchola's prognosis, your client was not restorable. That was her principal conclusion, which means that even outpatient would violate your least restrictive means test. Well, your honor, we're not... At all would have been. But the district court sat, listened to both experts, and disagreed with Dr. Menchola. Well, your honor, the problem is the case law in this area deals with the question of non-restorability. Strong really focused on that, and so did all the federal cases on 4241 proceeding strong. But the courts have held that it doesn't matter. If there's absolutely no chance that you can be restored, you still have to... The government can still take you in for eight months and make you sit in a BOP facility. We're not trying to fight that battle. We have two doctors. One said she might possibly be restorable. One said she wasn't. So we are conceding that she's going to have some treatment, but we maintain strongly that it should be outpatient. And the strong court did not address cell, which is also a medical decision about whether forced medication... Counsel, if you went the outpatient route and your client was not restored to health, what would happen at the end of that period? Well, your honor, if the least restrictive means... If our interpretation of the Constitution and the Rehabilitation Act carries the day, and she goes through an outpatient program for eight months, an extensive evaluation, and it is determined that she can't be restored, then that would be the end of it. The Constitution would require that to be the end of it. So the government doesn't get a second shot that says, gosh, outpatient didn't work. But we thought from the very beginning that something more aggressive would work. But the government doesn't get that second shot, does it? Well, the government could have another expert evaluate and see if they still have a different opinion that she still could be restored. That happens in outpatient just like it does in inpatient. The outpatient providers will ask for an extension if they think there's a substantial likelihood that it would be fruitful. So you basically use the same procedure, but just on an outpatient basis rather than an inpatient. But again, you have to keep in mind, my client is charged with a relatively minor non-violent felony. Her co-defendant got eight months. She's a very good candidate for a sentence that short or even probation. So the notion of putting her into a BOP facility for an extended period of time is really, really detrimental to her and detrimental to her legal interests as well. And as you may know, or you may not know, restoration at BOP typically takes eight months or longer because of the staffing shortages there. And there are transportation delays where clients not only have to, you know, endure a lengthy stay at the BOP facility, they also have to wait at the jail facility for months before they can even be transported. And, you know, certainly my client can self-report to the prison, but I don't, she likely does not have the means to do that. And under the way BOP operates now, she'll have to sit in jail for months getting no treatment at all before she even achieved and goes to BOP. And that is simply unacceptable under the Constitution. And I do want to emphasize that Jackson was the case that Strong relied upon heavily, but Jackson is an older case, 1972. It did not purport to reach this issue. It didn't, by its own terms, it said at the very least, there can't be indefinite detention based on incompetency to stand trial. It didn't reach the issue of the initial position to detain. Your position counsel is that Strong is no longer binding on this panel. Yes, it is because of Lopez Valenzuela, but also many aspects of our argument are not covered by Strong. For example, Lopez Valenzuela is our decision. Yes, it is, but it's an en banc decision and it is intervening authority. Strong was 2007, Lopez Valenzuela was 2014. And Jackson, which guided the court in Strong, predated FALCA, predated Salerno, predated SEL, predated so many decisions that were important. Now, whether you look at this under the pretrial detention rubric, which we've discussed, or under the involuntary commitment rubric, it does not pass muster because for involuntary commitment, there must be a finding by clear and convincing evidence, not only of mental illness or infirmity, but also of dangerousness. And that was something that Jackson didn't address because that law didn't even exist yet in Jackson. And I think it's very telling that in Salerno and rereading it over the weekend, pages 748 through 49, when the Salerno court is going through different categories of individuals who may be detained prior to trial, they say, dangerous defendants who have been found incompetent to stand trial. That's very telling, I believe. And also the procedural aspect of the due process clause supports it under VTIC, which I've explained in the briefs. And that is not strong addressed. Equal protection has really the same standards as due process, but we're talking about discrimination. And my client is being punished in a way that other defendants released under the Bail Reform Act are not being punished. And even though these groups are not different, they are similar enough. And Cleburne, the Supreme Court's decision, makes that clear. We also contend that a hybrid guarantee under Bearden and Oberfell also requires our result. The Rehabilitation Act, the Eighth Amendment, and we do think that the statute can be plausibly interpreted to satisfy our claims. And I'll reserve the rest of my time. I'm going to ask you one question, and if we take up too much of your time, I'll give you a little more time. So your brief is very comprehensive. And you argue numerous ways in which you think the statute is unconstitutional or violates other statutes. It's kind of the kitchen sink approach, right? Everything in the kitchen sink. I read it almost as if the brief was trying to convince me of cumulative error. Maybe one of these arguments alone isn't good enough, but if you look at them all together in the totality of all these arguments, there must be something. And of course, it's not going to work that way. So what's your best argument? And which one do you think is the strongest argument to say that this statute is invalid? Well, you know, it's interesting because all of the arguments apply a very, very similar standard. So they all work in our direction. I mean, in my heart of hearts, I think that this is a due process issue. And of course, strong has been the... Substantive due process or procedural? Both. I mean, I think, to be honest, Your Honor, I think the substantive due process, the procedural due process, the equal protection, particularly comparing the two groups of those who are released under the Bail Reform Act and allowed to remain at liberty and those who are released and then found incompetent. That's a very strong argument. The hybrid. I find Bearden particularly compelling in this context. The Eighth Amendment is very similar. And the Rehabilitation Act, as argued by the Arizona Center for Disability Law in the amicus brief in the Nino case. So I think they're all very strong arguments, Your Honor. So your answer is all of them. Not there's not one argument that you view as your leading argument. Okay. All right. Well, I'll save the rest of your time. Ms. Clements. Thank you, Your Honor. May it please the court. Shelley Clements for the U.S. Attorney's Office for the District of Arizona. This court should confirm the district court's order revanding the defendant to the custody of the attorney general for inpatient treatment and evaluation for the purposes of restoration to competency. This court in Nino and every other circuit that has addressed this statute have found that the provisions of 4241D are unambiguous. The defendant in their briefs assert that the statute requires a finding that inpatient treatment is the least restrictive alternative. But the plain language of the statute controls and it does not support that particular argument. The language specifically states that once the defendant is found incompetent by the court, that the court shall commit the defendant to the custody of the attorney general and the attorney general shall then hospitalize the defendant for treatment in a particular words. As such, this court looks to the ordinary common meanings of them. Shall denotes a requirement. Commit means to place officially in custody and confinement and hospitalized means to place in a hospital for treatment, care or observation. The defendant's argument that as is necessary somehow gives this court or gives the district court the ability to only place somebody if it's considered medically necessary is not supported by the grammatical structure of this particular act. The language mandating the person remanded AGs mandate that they place the defendant in a suitable hospital facility or hospitalized the defendant in suitable facilities in section D. The as is necessary language is then in D1, which talks about the time frame. That is for four months as is necessary. As such, it's clear that as is necessary only modifies the time, not the location. As such, this rule, the rule of entity would not apply in this particular case. As for the defendant's substantive due process argument, that case, that argument is foreclosed by this court's argument or this court's ruling in US v. Strong. And the district court in this Jackson v. Indiana. Contrary to the defendant's claim, the court in Strong conducted its own independent analysis of the due process issue. That is, it weighed the rights of the individual against the liberty interest at stake. And in doing so, it found that this statute did not violate due process. One, because the commitment was for a limited duration. And two, because the detention bore a reasonable relation to the purpose for which the individual was committed. In this case, the overarching purpose of 4241 D is to enable medical professionals to accurately determine whether a defendant is restorable to competency. And as this court has noted, as well as other circuits, for instance, I think it's the eighth and D'Onofrio and Ferro, they've noted that even when someone is potentially not restorable based off the initial assessment, the miracles of modern medical science might actually come up with a way to restore somebody. Because they've noted the government has both a compelling and legitimate interest in proceeding to trial in a timely manner on a case where criminal charges have been brought. There is a constitutionally essential interest that we not go to trial or have a defendant plead guilty who is incompetent to stand trial. In this particular instance, the infringement, which is limited statutorily to four months and can be only extended by further due process with the court, helps to limit any potential harm to the defendant in this particular case. Ms. Cunningham argued that there are circumstances where because of transportation delays or bed space availability or staffing shortages, a defendant who has been found incompetent might remain in a local facility, a local jail for months before being transferred to a federal medical center for attempted restoration. How do you respond to that? Do you think that that poses any constitutional problems? Well, I think we have to wait and see if that actually happens. At this point, the district court issued an order that the defendant did not have to report until a bed was available, thereby trying to alleviate any issues where she would, in fact, be just sitting and if that does, in fact, occur, she then has process. She can raise it with the court to object, and we're back in front of the court to figure out what we need to do to make sure that she is not detained unnecessarily. So in this case, the district court must have determined that she did not pose a danger to herself or others, and she's at liberty in the community. But what if the court decided that the person could be dangerous and they needed to be detained before being sent for treatment? And if they're detained for months before they're sent for treatment, is that a problem? No. Well, it's been raised as a problem because there's, once a person is found incompetent to stand trial, there's no reasonable relation between the detention in the jail and waiting to get to the facility. They're not being treated at that point. However, the courts in that instance provide the defendant with process, with the ability to go back to the court and the delay has been justified by the particular circumstances in that case. But I think your honor's question goes to kind of a bigger issue. The defendant seems to argue that this is only really an issue because the defendant's on pre-trial release, but wouldn't the same issues be at play if she has been detained? I mean, we're talking about one facility to another in another state to get treatment. The issues don't seem to jive there. Sure, she's being detained or would be detained in an instance either as a flight risk or a danger to the community. But the government still has the same overarching need to get a more thorough and accurate diagnosis than we've had in the past on this particular instance. I would note at this severity of her injury or whether or not she's restorable. The only thing they did agree on is that she's incompetent to stand trial at this point. Given the particular facts of this case, there are individual reasons to send her for this more in-depth and thorough evaluation. So, Ms. Clemons, it occurs to me that Ms. Cunningham argues that we should borrow definitions from the Medicare statute, from the Bail Reform Act, and define terms within the Insanity Act using terminology from other statutes. Looking at other statutes, the Speedy Trial Act provides a provision that the clock is stopped essentially as soon as somebody is deemed incompetent, which as I'm just thinking through this suggests that Congress knew these potential delays or at least they were not going to make a statutory speedy trial problem because they made that statute instead of clock stops. So, I'm not sure. I don't think either party briefed that. It just crossed my mind as I was listening to you. But I guess I'm interested in what you think of the interplay between the Speedy Trial Act and the Insanity Act. Well, I think Your Honor is absolutely right that Congress recognized that there is going to be some delay in getting a person to become restored to competency. It's not something that's going to happen with one visit with a doctor. It's certainly not something that's going to happen very quickly on an outpatient basis where they're meeting intermittently with a doctor as opposed to being in an inpatient facility where they're going to be evaluated and monitored constantly for a 24-hour period. So, Congress recognized that under their power to deal, to work with the mentally ill who have been charged and are incompetent to stand trial or insane, that they had that authority to issue certain rules and regulations in regard to that. So, there's no speedy trial issue there. But as far as the other definitions provided by defense counsel, first of all, Medicare definition of hospitalization in there at the very beginning of their definition statute, they say it's limited to this section. And as for the definitions, those are for habeas. As the court said in Malang v. Cook, that it was limiting when it was defining custody in a broad manner, that it was limiting its holding to custody for purposes of habeas. So, in this particular instance, while in other statutes, it may be that it can be determined broadly, Congress chose not to give a definition. So, under this court's case law, we look to the standard definition. But there's another thing. We take statutes in context. And there's another subsection, 4241E, that talks about discharge. And it talks about once the defendant is found competent, then she is to be discharged from the facility and be back on the Bail Reform Act, Section 207 or Chapter 207. That section makes no sense if the defendant is not hospitalized in a facility and therefore in need of discharge. And if Congress had meant to require something less than inpatient treatment, they would have said so. They would have said, either put as is necessary earlier in 4241D, or they would have said the defendant will be referred to treatment as ordered by the government as is suitable. But they didn't do that because they were following the recommendations of the Supreme Court in Jackson v. Indiana, which did not have a problem with the commitment itself, but had a problem with indefinite nature of it. In Jackson, the court noted that the government was arguing that the commitment was not indefinite. And they said, if that were actually true, the ruling might have been different. So, the issue is not with the commitment itself. Further, this particular statute provides plenty of due process for this particular defendant to make sure that there's not an unjust deprivation of liberty. There's a three-part structure contained within this statute. She cannot be committed without a finding by the court that she's incompetent, which in this case was raised by her counsel. She cannot be forcefully medicated unless there's further due process. She cannot be held beyond the four-month limitation unless they go back to the court and the court makes a finding that holding her a little longer will lead to a substantial probability that she could be restored within a reasonable time. Further, she cannot go back to trial, be found to be competent in trial unless the government proves that she is now competent to stand trial and the court makes that finding. This particular statute provides a lot of process to make sure there's no undue deprivation of liberty. In looking at the second part of the Matthews v. Eldridge test to determine whether procedural due process has been met, in this case, there's the risk of she's incompetent, the government has stipulated that she's incompetent, and the medical evidence supports that. So there's no way that she is being sent for treatment improperly at this point. In addition, given the third factor, the government's interest, including our fiscal administrative burdens, again, we've already had two outpatient evaluations that could not agree as to certain facets, including whether she was restorable. This point, individually, the government's fiscal burdens are not met by having another outpatient evaluation. In this particular case, the defendant needs this long-term evaluation and treatment so we can determine whether or not she truly is restorable. In regards to the equal protection argument, as we've noted in our brief, and I won't go through this in detail, the three groups that the defendant has identified, she is not similarly situated with. Therefore, under Pimentel v. Dreyfus, she has not met her burden. That's an initial burden. She has to show that they're similarly situated. And in this particular case, none of the three groups that she shows that she raises as a due process issue are similarly situated. They're not in similar circumstances with their criminal cases and they're not being held for the same reasons. Further, as this court noted, as Spring Court has and claim a disparity. As to the defendant's hybrid argument, the district court did not err in finding that 4241D does not violate some form of hybrid due process. The Supreme Court and this court have already held that deprivation of liberty for any reason for any length of time is subject to due process protections, which have already been addressed in Strong as well as in other cases. Bearden, NJP, and Obergefell do talk about the fact that there's a convergence between due process arguments and equal protection. But in doing so, they didn't create some sort of super protection. They did say sometimes they'll be evaluated under equal protection and sometimes they'll be evaluated under due process. But the fact that they could be evaluated under both doesn't somehow give the defender a greater right or somehow make her argument more availing. As this court has already found in Nino, the Bail Reform Act and excessive bail arguments are not applicable in this matter. The defendant is not being detained for purposes of bail. She is being detained for another purpose other than flight or danger to the community. And again, Congress can limit pretrial release in light of the government's interest in restoring a defendant's competency so the prosecution can move forward. And also, the overarching purpose of not the constitutionally essential interest of ensuring that somebody who's incompetent doesn't end up pleading guilty or going to trial when they should not be. Finally, as to the Rehabilitation Act, as the government argued in our brief, the Rehabilitation Act and the ADA are civil statutes with civil rights of enforcement, as the Supreme Court stated in Barnes v. Gorman. The defendant's reliance on PDEVA v. ICE is not applicable in this case because in that case, these immigration defendants were raised a constitutional due process argument in their class action suit, which the government argued should have been raised in a writ of habeas corpus in their individual cases. And the court found at that point, the judicial economy didn't require that they go back and raise it separately. But again, they were raising a constitutional due process argument that could be raised in both for a broader purpose. In addition, this court in Neno found that the Rehabilitation Act statute is very broad, whereas the 4241D is a very specific criminal statute, and therefore, it would not be controlled by that. I would also note the defendant cites Olmstead, which talks about improper institutionalizing of defendants. First, we are not seeking to institutionalize the defendant. We are seeking a very limited commitment for a very limited purpose. But a constitutionally essential interest in having her restored to competency. We are not seeking to help her with her daily living needs, which is what typically happens in an institutionalized setting. There are many things that happen. They will address malingering, although that doesn't really seem to be an issue in this case. They will also determine whether medication would be appropriate, which given the concerns that were raised in cell, it would seem that would appropriate to do in an inpatient setting than an outpatient setting. Finally, Olmstead did have a three-part test. The first part of which is that somebody should be living outside the custody of an institution. First part being the state's treatment professionals deem outpatient to be appropriate. The defendant has yet to be evaluated by the government's treatment officials, which is what will happen when she goes to Butner or to whatever facility is designated and they determine the appropriate facility to place her. Your Honor, in order to do what the defendant is asking, you would have to find that the district court erred in relying on strong and overrule that panel decision. You would have to overrule Supreme Court's case of Jackson v. Indiana. You would be requiring the court to have a mini trial on outpatient versus inpatient, thus constructively amending 4241D's mandate of inpatient treatment or basically placing the custody of the Attorney General for determining the appropriate facility. You would have to find that the Rehabilitation Act, which is a statute of general construction, supplants a very specific status regarding the competency in a criminal matter in contraventions of all statutory construction. Finally, you would have to find that words like shell, commit, and hospital are vague, even though their common meanings are well-known and unambiguous. At this point, the government will rest on their brief unless the court has any further questions. Okay. Thank you, Ms. Clemmons. All right. Ms. Cunningham, you're still muted. We can't hear you. Sorry about that. As an initial matter, this would not just be another outpatient evaluation. These are established programs where defendants go two, three, four times a week on a regular basis for months. So it is a very detailed evaluation. And I would just say that, as I said before, it's the federal system that's the outlier here. The vast majority of states are not requiring this. There are established outpatient programs, constitutional standards for both pretrial detention and involuntary commitment support our argument. So does the Rehab Act, and so do American Court Association standards. Counsel, what's your response to the argument that what you're seeking to do here is to put the cart before the horse? You want, in essence, a full-blown psychiatric evaluation and a determination as to whether or not your client is subject to restorability before she's even been evaluated to confirm that she is, in fact, not competent and not suitable or amenable for treatment. Well, Your Honor, again, practice bears out that that is not true. This happens all the time in many states across the country, including Arizona. It's easy for doctors to say, look, this defendant has this sort of mental health problem. We think that she would be better treated in an outpatient facility as the doctor opined in this case. The district court is in a good position to listen to the opinions of doctors as to whether treatment should be outpatient or inpatient. Certainly, if the defendant poses a danger to self or others, it would have to be outpatient, but that is not the case here. Would you put a timeline on how long outpatient treatment would be afforded before a determination is made? Because it seems to me that the government does have an interest here under the Speed Trial Act in seeing to it that if she is restorable, that she get restored so that the criminal case can recommit. Well, yes, Your Honor, and these competency programs typically take about, you know, four to eight months, give or take. And to be honest, because BOP has such severe staffing shortages, it's likely to take longer there than it is in an outpatient program. As Judge Soto, the judge in our case, recognized, the outpatient programs work very well in Arizona. And Judge Soto's argument, and I do think all of the arguments point in the same direction, but the Due Process Clause is very clear, and Lopez Valenzuela makes it very clear, that detention cannot occur unless it is necessary. And all we are asking is for the district court to have to find, by clear and convincing evidence, that inpatient confinement is necessary to achieve the government's interests. It is something that is done all the time in other states, it is very workable, and it would solve the problems here. And we do, again, and I apologize, but my co-counsel was able to speak a lot more than I was, because there weren't as many questions. But all we're talking about with the statutory interpretation... You've got a tougher burden here. Well, I realize that, Your Honor, but I... We should declare the statute either ambiguous and give the district court authority that the statutory language doesn't seem to give it, or that we should dictate to the Attorney General that suitable facilities should be reinterpreted to include outpatient treatment. Well, Your Honor, I do think that we've provided an abundance of authority as to why this causes great constitutional concerns and concerns under the Rehabilitation Act. The bar for interpreting the statute is not high. It just has to be in an outpatient facility, because when they're going to the outpatient treatment, they go in and out of a facility. And when they are done with the treatment, they can be discharged from out... That was quite different in the sense that there was an irrebuttable presumption in the Arizona proposition that we don't have here. What we have is a requirement of due process for a hearing and then a district court determination. Well, here there is an irrebuttable presumption that once you're found incompetent to stand trial, you have to have inpatient treatment to achieve the government's objectives. And that is just empirically not true, as we know from what happens in Arizona and many other states across the country. Okay. All right. Thank you, Ms. Cunningham. Thank you both for your arguments this afternoon, and we'll take this case in submission. And I believe that ends our calendar for this afternoon, so we'll be adjourned until tomorrow. Thank you. Thank you. Thank you.
judges: Tallman, Bybee, Bade